Stephen C. Ruehmann (167533)
Robin D. Shofner, Esq. (272552)
**RUEHMANN LAW FIRM, P.C.**
9580 Oak Avenue Parkway, Suite 15
Folsom, CA 95630
Tel (916) 988-8001
Fax (916) 988-8002

Attorneys for Plaintiffs
WILLIAM H. BASKIN and JUDI M. BASKIN

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| WILLIAM H. BASKIN and JUDI M. BASKIN, | Case No.: 3:11-cv-00825-SC |
| Plaintiffs, | **PLAINTIFFS' FIRST AMENDED COMPLAINT FOR:** |
| vs. | |
| WELLS FARGO BANK, N.A.; CITIMORTGAGE, INC.; CITIGROUP, INC.; and DOES 1-100, inclusive, | 1. **Negligence (Violation of Cal. Civ. Code §§ 2924 & 2934a(d))** |
| | 2. **Breach of Contract** |
| Defendants. | 3. **Unfair Business Practices (Violation of Cal. Bus. & Prof. Code § 17200 et seq.)** |
| | **DEMAND FOR JURY TRIAL** |

**COMES NOW** Plaintiffs WILLIAM H. BASKIN ("Mr. BASKIN") and JUDI M. BASKIN ("Mrs. BASKIN") (collectively "Plaintiffs") who aver the following:

## PARTIES

1.      At all relevant times, Plaintiffs were adult residents of San Mateo County, California.  Plaintiffs are the sole owners of certain real property commonly known as 2319 Vera Avenue, Redwood City, California 94602 (the "Subject Property").

2.      At all times mentioned herein, Defendant WELLS FARGO BANK, N.A. ("WELLS FARGO") was and is a National Association, doing business in San Mateo County, California, with a main business address of 101 North Phillips Avenue, Sioux Falls, South

Dakota 57104. Plaintiffs maintain on information and belief that WELLS FARGO is the owner of their loan.

3. At all times mentioned herein, Defendant CITIMORTGAGE, INC. ("CITIMORTGAGE") was and is a New York Corporation, doing business in San Mateo County, California, with a main mailing address of PO Box 30509, Tampa, Florida 33631. CITIMORTGAGE is the servicer of Plaintiffs' loan.

4. At all times mentioned herein, Defendant CITIGROUP, INC. ("CITIGROUP") was and is a Delaware Corporation, doing business in San Mateo County, California, with a main business address of 399 Park Avenue, New York, New York 10043. CITIGROUP is the parent company of CITIMORTGAGE.

5. Plaintiffs are ignorant of the true name and capacity of each Defendant sued herein as DOES 1 through 100, inclusive, and therefore sue those Defendants by such fictitious names. Plaintiffs will seek leave to amend this complaint to include the true names and capacities of those Defendants when they have been ascertained.

6. Plaintiffs are informed, believe and thereon allege that, at all times herein mentioned, each Defendant sued herein in relation to the property they claim an interest in was the agent and/or employee of each of the remaining Defendants thereof and at all times was acting within the purpose and scope of such agency and/or employment.

7. At all relevant times, each Defendant knew or realized that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Knowing or realizing that the other Defendants were engaging in or planning to engage in unlawful conduct, each Defendant nevertheless facilitated the commission of those unlawful acts. Each Defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

8. At all relevant times, Defendants have engaged in a conspiracy, common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint.

///

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

## JURISDICTION

9.     This Court has jurisdiction over the subject matter of this complaint under 28 U.S.C. §§ 1441(b) because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

10.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the property that is the subject of this case is located in San Mateo County, California.

## BACKGROUND FACTS

12.     On or about May 6, 2005, Plaintiffs applied for a refinance loan using the Subject Property as hereinabove described as collateral in a contract of mortgage with ABN Amro Mortgage Group, Inc. as the lender.

13.     Plaintiffs entered into a Deed of Trust securing the sum of $730,000.00 based on a 30-year fixed rate mortgage ("ARM") with an interest rate of 6.000%. (A true and correct copy of the Deed of Trust is attached as **Exhibit 1**, and shall be incorporated by this reference as though fully set forth herein.) Plaintiffs' monthly mortgage payments (principal and interest only) were $4,376.72. (A true and correct copy of a citimortgage.com screen shot detailing Plaintiffs' permanent modification terms compared to their prior loan terms is attached as **Exhibit 2**, and shall be incorporated by this reference as though fully set forth herein.)

14.     Plaintiffs allege that at some point after the close of escrow, the ownership of their loan was transferred to WELLS FARGO and the servicing of their loan was transferred to CITIMORTGAGE, a subsidiary of CITIGROUP.

15.     The escrow was closed, and Plaintiffs made mortgage payments and continued to do so. In or about October 2008, Mr. BASKIN lost his job but Plaintiffs continued to make their monthly mortgage payments.

16.     In anticipation of exhausting Mr. BASKIN's unemployment benefits, in or about August 2009, Mr. BASKIN contacted CITIMORTGAGE to discuss Plaintiffs' monthly

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

mortgage payment. At that time, a CITIMORTGAGE employee informed Mr. BASKIN that Plaintiffs might qualify for a loan modification. The CITIMORTGAGE employee asked Mr. BASKIN a series of questions after which the CITIMORTGAGE employee informed Mr. BASKIN that Plaintiffs had been approved for a loan modification.

17.     The terms of the loan modification are as follows: Plaintiffs would receive a permanent loan modification wherein their interest rate would be fixed at 2.000% for the remainder of the loan which would be increased to a 40-year term. (See *Ibid*.) In return, Plaintiffs would make their monthly mortgage payments (principal, interest, tax and insurance) in the amount of $3,020.82. (See *Ibid*.) CITIMORTGAGE also agreed that it would not proceed with any foreclosure against the Subject Property so long as Plaintiffs made the agreed upon monthly payments. CITIMORTGAGE informed Mr. BASKIN that Plaintiffs would receive the written permanent modification agreement memorializing the aforementioned terms in the mail shortly. (A true and correct copy of a citmortgage.com screenshot stating that Plaintiffs' loan modification is complete is attached as **Exhibit 3**, and shall be incorporated by this reference as though fully set forth herein.)

18.     Plaintiffs began making timely payments pursuant to the permanent modification agreement. After making the first payment, Mr. BASKIN contacted CITIMORTGAGE to inquire why Plaintiffs had not yet received the written permanent modification agreement memorializing the terms that both parties had agreed to. A CITIMORTGAGE employee told Mr. BASKIN that Plaintiffs could expect the agreement in the mail by "next week." Mr. BASKIN waited but no agreement ever arrived. Each time that Mr. BASKIN called CITIMORTGAGE to inquire why Plaintiffs had not received the written agreement, a CITIMORTGAGE employee informed him that it would arrive "next week" or "at the end of the month."

19.     In or about October 2009, Mr. BASKIN contacted CITIMORTGAGE to inform it that Mrs. BASKIN's employer had transferred her position to Austin, Texas for two years and that they were moving to Austin, Texas for the duration of Mrs. BASKIN's job relocation. Mr. BASKIN also informed CITIMORTGAGE that Plaintiffs were merely renting a property in

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

Austin, Texas and that they intended to move back into the Subject Property at the end of the two years. CITIMORTGAGE informed Mr. BASKIN that this would have no effect on his permanent modification so long as Plaintiffs still considered the Subject Property their primary residence, which they did.

20. Growing tired of waiting for the agreement to arrive, Mr. BASKIN informed CITIMORTGAGE that Plaintiffs would not make their next payment unless Plaintiffs received the agreement in the mail. CITIMORTGAGE employees constantly assured Mr. BASKIN that the agreement would arrive shortly and Plaintiffs continued making their modified mortgage payments pursuant to the terms of the agreed upon permanent modification.

21. In or about September 2010, Mr. BASKIN contacted CITIMORTGAGE again to inquire into why Plaintiffs had not received the permanent modification paperwork as promised. At that time, a CITIMORTGAGE employee informed Mr. BASKIN that Plaintiffs would not receive the permanent modification paperwork in the mail because they did not qualify for the promised modification. The CITIMORTGAGE employee explained that Plaintiffs did not qualify because they did not reside in the Subject Property. However, CITIMORTGAGE was informed that Plaintiffs did not reside in the Subject Property in October 2009, after which CITIMORTGAGE solicited Plaintiffs to make 11 payments totaling $33,229.02 pursuant to the permanent modification agreement.

22. To this date, CITIMORTGAGE has not sent Plaintiffs the promised written permanent modification agreement. CITIMORTGAGE's failure to provide the Plaintiffs with a written permanent modification agreement constituted a breach of the permanent modification agreement.

23. Despite the fact that Plaintiffs performed all of their obligations under the permanent modification agreement by paying their monthly payments in a timely fashion, CR Title Services, Inc. ("CR Title") recorded a Notice of Default ("NOD") against the Subject Property on October 18, 2010. (A true and correct copy of the NOD is attached as **Exhibit 4**, and shall be incorporated by this reference as though fully set forth herein.) The recordation of the NOD constituted a breach of the permanent modification agreement between

CITIMORTGAGE and Plaintiffs.

24. Plaintiffs allege that CR Title did not have the authority to record an NOD against the Subject Property on October 18, 2010 because CR Title was not a trustee, beneficiary or authorized agent under the Deed of Trust per Civil Code § 2924. (See *Ibid.*) The actual trustee as named on the Deed of Trust is First American Title Co. ("First American"), not CR Title. (See **Exhibit 1**.)

25. In or around October 2010, Mr. BASKIN again contacted CITIMORTGAGE to contest its failure to provide Plaintiffs with the promised written permanent modification agreement. At that time, CITIMORTGAGE told Mr. BASKIN to submit a loan modification application along with all supporting documents. Plaintiffs promptly sent in all the requested materials. When Mr. BASKIN again contacted CITIMORTGAGE to follow up on Plaintiffs' modification application, CITIMORTGAGE told him several times that it had misplaced Plaintiffs' documentation. As result, Plaintiffs sent in the modification application along with all supporting documentation three to four times. Plaintiffs have not yet received a response from CITIMORTGAGE regarding their eligibility for a second loan modification.

26. On January 19, 2010, CR Title recorded a Notice of Trustee's Sale ("NOS") against the Subject Property. (A true and correct copy of the NOS is attached as **Exhibit 5**, and shall be incorporated by this reference as though fully set forth herein.) The NOS states that the Trustee's Sale is set to occur on February 9, 2011. (See *Ibid.*) Again, because CR Title is not a substituted trustee or an agent of WELLS FARGO, the NOD, NOS and entire foreclosure are void.

27. Since that time, the Trustee's Sale has been postponed and is now scheduled to occur on April 11, 2011.

28. This action also concerns Defendants' unlawful, fraudulent and unfair business acts or practices. Defendants engaged in a campaign of deceptive conduct and concealment aimed at maximizing the number of consumers who would accept this type of high-risk loan in order to maximize Defendants' profits, even as Defendants knew their conduct would cause many of these consumers to lose their homes through foreclosure. To add insult to injury,

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

Defendants are now breaching their permanent modification agreement with Plaintiffs by failing to honor the permanent modification agreement and proceeding with foreclosure on the Subject Property.

### FIRST CAUSE OF ACTION
#### Negligence (Violation of Cal. Civ. Code §§ 2924 & 2934a(d))
#### Against WELLS FARGO, DOES 1-100

29.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as though fully set forth herein.

30.     Plaintiffs allege that at all times mentioned herein the Subject Property was listed as their primary residence on their loan application and that that Plaintiffs are members of the class of persons protected under California Civil Code §§ 2924 and 2934a.

31.     California Civil Code § 2924 provides that a trustee, mortgagee, or beneficiary, or any of their authorized agents, must file an NOD in the office of the recorder in order to initiate a foreclosure.

32.     California Civil Code § 2934a(d) specifies that a trustee named in a recorded Substitution of Trustee shall be deemed to be authorized to act as the trustee under the mortgage or deed of trust for all purposes from the date the substitution is executed by the mortgagee, beneficiaries, or by their authorized agents. Once recorded, the substitution shall constitute conclusive evidence of the authority of the substituted trustee or his or her agents to act.

33.     CR Title recorded an NOD on October 18, 2010 despite the fact that it had not been substituted as the foreclosing trustee. (See **Exhibit 4**.) Because the Deed of Trust names First American as the trustee and not CR Title, CR Title had no authority to record an NOD against the Subject Property as a trustee. (See **Exhibit 1**.) Further, Plaintiffs allege on information and belief that CR Title cannot establish through any document or otherwise that it was the agent of the beneficiary, WELLS FARGO, at the time that it recorded the NOD.

34.     Because CR Title had not been substituted in as the foreclosing trustee and was not an agent of WELLS FARGO at the time the NOD was recorded, CR Title had no authority to record the NOD. (See **Exhibit 4**.) Further, because CR Title was never substituted in as the foreclosing trustee, CR Title had no authority to record an NOS against the Subject Property on

PLAINTIFFS' FIRST AMENDED COMPLAINT FOR DAMAGES

January 19, 2010. (See **Exhibit 5**.) As a result, the NOD, NOS and entire foreclosure are void. (*Wanger v EMC Mortgage Corp.* (2002) 103 Cal.App.4th 1125; *Sweatt v. Foreclosure Co.* (1985) 166 Cal.App.3d 273, 278; *Miller v. Cote* (1982) 127 Cal.App.3d 888, 894.) A foreclosure process predicated on a defective NOD is invalid as a matter of law. (See *Miller, supra,* 127 Cal.App.3d at 894 [a premature NOD is fatally defective].)

35.     Defendants breached their duty under California Civil Code §§ 2924 and 2934a(d) by unlawfully commencing and proceeding with foreclosure on the Subject Property without the proper authority to do so. WELLS FARGO's breach has caused Plaintiffs damages in that they stand to lose their property at a Trustee's Sales on April 11, 2011 despite WELLS FARGO's failure to comply with California foreclosure law. Further, as a direct and proximate result of WELLS FARGO's unlawful conduct described herein, Plaintiffs have also suffered additional compensatory damages according to proof.

### SECOND CAUSE OF ACTION
**Breach of Contract**
**Against All Defendants**

36.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as though fully set forth herein.

37.     In or about August 2009, Mr. BASKIN contacted CITIMORTGAGE to discuss Plaintiffs' monthly mortgage payment. At that time, a CITIMORTGAGE employee informed Mr. BASKIN that Plaintiffs might qualify for a loan modification. The CITIMORTGAGE employee asked Mr. BASKIN a series of questions after which the CITIMORTGAGE employee informed Mr. BASKIN that Plaintiffs had been approved for a loan modification.

38.     The terms of the loan modification are as follows: Plaintiffs would receive a permanent loan modification wherein their interest rate would be fixed at 2.000% for the remainder of the loan which would be increased to a 40-year term. (See **Exhibit 2**.) In return, Plaintiffs would make their monthly mortgage payments (principal, interest, tax and insurance) in the amount of $3,020.82. (See *Ibid.*) CITIMORTGAGE also agreed that it would not proceed with any foreclosure against the Subject Property so long as Plaintiffs made the agreed upon

monthly payments. CITIMORTGAGE informed Plaintiffs that they would receive the written permanent modification agreement memorializing the aforementioned terms in the mail shortly. (See **Exhibit 3**.)

39. Plaintiffs began making timely payments pursuant to the permanent modification agreement. After making the first payment, Mr. BASKIN contacted CITIMORTGAGE to inquire why Plaintiffs had not yet received the written permanent modification agreement memorializing the terms that both parties had agreed to. A CITIMORTGAGE employee told Mr. BASKIN that Plaintiffs could expect the agreement in the mail by "next week." Mr. BASKIN waited but no agreement ever arrived. Each time that Mr. BASKIN called CITIMORTGAGE to inquire why Plaintiffs had not received the written agreement, a CITIMORTGAGE employee informed him that it would arrive "next week" or "at the end of the month."

40. In or about October 2009, Mr. BASKIN contacted CITIMORTGAGE to inform it that Mrs. BASKIN's employer had transferred her position to Austin, Texas for two years and that Plaintiffs were moving to Austin, Texas for the duration of Mrs. BASKIN's job relocation. Mr. BASKIN also informed CITIMORTGAGE that Plaintiffs were merely renting a property in Austin, Texas and that they intended to move back into the Subject Property at the end of the two years. The CITIMORTGAGE informed Mr. BASKIN that this would have no effect on Plaintiffs' permanent modification so long as Plaintiffs still considered the Subject Property their primary residence, which they did.

41. Growing tired of waiting for the agreement to arrive, Mr. BASKIN informed CITIMORTGAGE that Plaintiffs would not make their next payment unless Plaintiffs received the agreement in the mail. CITIMORTGAGE employees constantly assured Mr. BASKIN that it would arrive shortly and Plaintiffs continued making their modified mortgage payments pursuant to the terms of the agreed upon permanent modification.

42. In or about September 2010, Mr. BASKIN contacted CITIMORTGAGE again to inquire into why Plaintiffs had not received the permanent modification paperwork as promised. At that time, a CITIMORTGAGE employee informed Mr. BASKIN that Plaintiffs would not

ever receive the permanent modification paperwork in the mail because they did not qualify for the promised modification. The CITIMORTGAGE employee explained that Plaintiffs did not qualify because they did not reside in the Subject Property. However, CITIMORTGAGE was informed that Plaintiffs did not reside in the Subject Property in October 2009, after which CITIMORTGAGE solicited Plaintiffs to make 11 payments totaling $33,229.02 pursuant to the permanent modification agreement.

43. To this date, CITIMORTGAGE has not sent Plaintiffs the promised written permanent modification agreement. CITIMORTGAGE's failure to send the permanent modification agreement as promised constitutes a breach of the permanent modification agreement.

44. Despite the fact that Plaintiffs performed all of their obligations under the permanent modification agreement by paying their monthly payments in a timely fashion, CR TITLE recorded an NOD against the Subject Property on October 18, 2010. (See **Exhibit 4**.) The recordation of the NOD constituted a separate and distinct breach of the permanent modification agreement between CITIMORTGAGE and Plaintiffs.

45. CR Title also recorded an NOS against the Subject Property on January 19, 2011. (See **Exhibit 5**.) The NOS states that the Subject Property will be sold at a Trustee's Sale on February 9, 2011. (See *Ibid*.)

46. At all times, CITIMORTGAGE was acting as an agent of WELLS FARGO.

47. Furthermore, WELLS FARGO, CITIMORTGAGE and CITIGROUP are estopped from claiming that no permanent modification agreement exists or that Plaintiffs did not provide any consideration for the agreement because Plaintiffs detrimentally relied on CITIMORTGAGE's promise to modify. Plaintiffs so detrimentally relied by making the modified payments of $3,020.82 for 11 months pursuant to the permanent modification agreement.

48. Plaintiffs are entitled to the benefit of their bargain and seek to have the permanent modification agreement specifically enforced pursuant to the terms referenced above. Alternatively, Plaintiffs have been damaged by the above-mentioned breach both as a result of

the monies that they have already paid in reliance on the contract and also because they now face the loss of the Subject Property at a Trustee's Sale scheduled for April 11, 2011, and are entitled to compensatory damages in an amount to be determined at trial

**THIRD CAUSE OF ACTION**
**Unfair Business Practices (Violation of Cal. Bus. & Prof. Code § 17200 et seq.)**
**Against All Defendants**

49.     Plaintiffs re-allege and incorporate by reference the allegations contained in the paragraphs above as though fully set forth herein.

50.     Plaintiffs allege that the unlawful acts and practices of Defendants alleged above constitute unfair business acts and/or practices within the meaning of California Business and Professions Code § 17200 et seq.

51.     Plaintiffs allege that by: 1) allowing CR Title to record an NOD and NOS against the Subject Property despite the fact that CR Title did not have the authority to do so; and 2) breaching the permanent modification contract with Plaintiffs, Defendants have committed one or more unfair business acts within the meaning of California Business and Professions Code § 17200 et seq.

52.     Plaintiffs allege that Defendants' unlawful business acts and/or practices as alleged herein have violated numerous laws and regulations including California Civil Code §§ 2924 and 2934a(d). Said predicate acts are therefore per se violations of California Business and Professions Code § 17200 et seq.

53.     Defendants' misconduct, as alleged herein, gave Defendants an unfair competitive advantage over their competitors. Specifically, WELLS FARGO was able to proceed with foreclosure despite not complying with California foreclosure law. This allowed WELLS FARGO to operate at a higher profit margin than lenders who do comply with California foreclosure law. Further, WELLS FARGO, CITIMORTGAGE and CITIGROUP were able to obtain monthly payments from Plaintiffs for over a year without having any intention of permanently modifying their loan as promised. In failing to actually modify Plaintiffs' loan, WELLS FARGO, CITIMORTGAGE and CITIGROUP reaped the benefit of the modification

without any of the burdens of actually modifying, unlike their competitors who actually modified loans.

54.     Plaintiffs allege that the unlawful acts and practices, as fully described herein, present a continuing threat to members of the public to be misled and/or deceived by Defendants as described herein.  Borrowers, such as Plaintiffs, have been induced to their detriment to rely on the promise of WELLS FARGO, CITIMORTGAGE and CITIGROUP to permanently modify their loans.  In so relying, these borrowers, who are already faced with the unlawful foreclosure of their properties, are then induced to make payments that will not enable them to save their homes.  As a result, these borrowers lose not only money but also the opportunity to seek an alternative resolution that will allow them to save their homes.  Plaintiffs and other potential borrowers have no other remedy at law that will prevent Defendants' misconduct, as alleged herein, from occurring and/or recurring in the future.

55.     Plaintiffs allege that as a direct and proximate result of Defendants' unlawful conduct, as alleged herein, they may lose their home in a Trustee's Sale on February 9, 2011. Plaintiffs are direct victims of Defendants' unlawful conduct, as herein alleged, have suffered injury in fact and have lost money as a result of Defendants' unfair competition.

56.     Plaintiffs allege that they are entitled to equitable relief, including restitution, disgorgement of all profits accruing to Defendants because of their unlawful and deceptive acts and practices, costs, and declaratory relief.

57.     As a direct and proximate result of the aforementioned acts, Defendants received monies and continue to hold monies expended by Plaintiffs who purchased the loan as described herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against all of the Defendants and each of them as follows:

1.  That the foreclosure or attempted foreclosure of the Subject Property be immediately enjoined pending resolution of this matter on the merits or at least until Defendant WELLS FARGO complies with Civil Code § 2924 by having an authorized party

record an NOD;

2. That the permanent modification agreement between Plaintiffs and CITIMORTGAGE be specifically enforced according to the terms outline above;

3. That the actions of all of the Defendants be determined to be unfair and deceptive business acts and/or practices in violation of California Statutes and that this Court award all such relief to Plaintiffs as they may be entitled, including injunctive relief;

4. For compensatory damages according to proof;

5. For an award of costs of suit incurred; and

6. For any other relief the Court may deem just and proper.

Dated: March 22, 2011     RUEHMANN LAW FIRM, P.C.


           /s/ Robin D. Shofner
           Robin D. Shofner, Esq.
           Attorney for Plaintiffs
           WILLIAM H. BASKIN and JUDI M. BASKIN

# EXHIBIT 1

*263(825*

4311- 1879052

When recorded mail to:
ABN AMRO MORTGAGE GROUP, INC.
1201 EAST LINCOLN
MADISON HEIGHTS, MICHIGAN 48071-4171
ATTN:FINAL/TRAILING DOCUMENTS

**2005-077705**
FIRST AMERICAN TITLE COMPANY
08:00am 05/12/05 DT Fee: 43.00
Count of pages 13
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*2 0 0 5 0 0 7 7 7 0 5 A R*

13/2

———————————————— [Space Above This Line For Recording Data] ————————————————

LOAN #: 649080764

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated MAY 6, 2005,               together with all Riders to this document.

(B) "Borrower" is WILLIAM H BASKIN,  AND JUDI M BASKIN,.

Borrower is the trustor under this Security Instrument.
(C) "Lender" is ABN AMRO MORTGAGE GROUP, INC.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3005 1/01
© 1999-2004 Online Documents. Inc                    Page 1 of 12

Initials:
CAUDEED          CAUDEEN  0402
05-05-2005  14:53

Lender is a CORPORATION organized and existing under the laws of
DELAWARE. Lender's address is 2600 W. BIG BEAVER
RD., TROY, MICHIGAN 48084.

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is *First American Title Co*

(E) "Note" means the promissory note signed by Borrower and dated MAY 6, 2005. The Note
states that Borrower owes Lender *********************SEVEN HUNDRED THIRTY THOUSAND AND NO/100
***************************************************** Dollars (U.S.     $730,000.00     )
plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later
than JUNE 1, 2035.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under
the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be
executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider             ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider ☐ Other(s) [specify]
☐ 1-4 Family Rider             ☐ Biweekly Payment Rider
☐ V.A. Rider

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and
administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that
are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or
similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic
tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is
not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any
third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or
destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu
of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus
(ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing
regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or
successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA"
refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the
Loan does not qualify as a "federally related mortgage loan" under RESPA.
(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party
has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications
of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the

Initials:
CAUDED/ 0402
05-05-2005 14:53

Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the  COUNTY                                                    [Type of Recording Jurisdiction]
of  SAN MATEO                                   [Name of Recording Jurisdiction]:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of  2319 VERA AVE, REDWOOD CITY,

[Street] [City]

California     94062          ("Property Address"):
            [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.   **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3005 1/01
© 1999-2004 Online Documents, Inc.                          Page 3 of 12

Initials:
CAUDILL  0402
05-05-2005 14:53

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken

Initials: ____
CAUDOL  0402
05-05-2005 14:53

promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Initials: CAUDEDU 0402
05-05-2005 14:53

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a)** Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

**(b)** Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an

Initials:
CAUDEDL 0402
05-05-2005 14:53

opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Initials:
CAUDE01  0402
05-05-2005  14:53

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay

Initials: _____
CAUDEDU 0402
05-05-2005 14:53

all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal

Initials: ___
CAUDEL  6402
05-05-2005 14:53

residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

Initials:
CAUDELL   0402
05-05-2005 14:53

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
WILLIAM H BASKIN

_____ (Seal)
JUDI M BASKIN

State of CALIFORNIA                    County of: _Santa Clara_

On _5/6/05_, before me, _Sandra Winter_, personally appeared WILLIAM H BASKIN AND JUDI M BASKIN, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.



SANDRA WINTER
Comm. # 1379527
NOTARY PUBLIC-CALIFORNIA
Santa Clara County
My Comm. Expires Oct 12, 2008

_____

CALIFORNIA--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01
© 1999-2004 Online Documents, Inc.                    Page 12 of 12                    CAUDEDL 0402
                                                                          05-05-2005 14:53

## DESCRIPTION

All that certain land situated in the State of California, County of **SAN MATEO**, City of **REDWOOD CITY**, described as follows:

PARCEL I:

LOT 4 IN BLOCK 16 AS SHOWN ON THAT CERTAIN MAP ENTITLED "KENSINGTON SQUARE, SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA ON NOVEMBER 3, 1925 IN BOOK 12 OF MAPS AT PAGES 74 AND 75.

PARCEL II:

A NON-EXCLUSIVE EASEMENT FOR INGRESS AND EGRESS AND OR FOR THE PLANTING OF LANDSCAPING WITHIN A PORTION OF LOT 3 IN BLOCK 16 AS SHOWN ON THAT CERTAIN MAP ENTITLED "KENSINGTON SQUARE, SAN MATEO COUNTY, CALIFORNIA", FILED IN THE OFFICE OF THE COUNTY RECORDER OF SAN MATEO COUNTY, STATE OF CALIFORNIA ON NOVEMBER 3, 1925 IN BOOK 12 OF MAPS AT PAGES 74 AND 75. SAID PORTION BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT THE CORNER OF LOTS 3 AND 4, BLOCK 16 AT THE SOUTHERLY RIGHT OF WAY LINE OF VERA AVENUE, AS SAID LOTS, BLOCK AND AVENUE ARE SHOWN ON AFOREMENTIONED MAP, THENCE FROM SAID POINT OF BEGINNING, SOUTH EASTERLY ALONG THE COMMON LINE OF SAID LOTS 3 AND 4, SOUTH 45 DEGREES 09' 00" EAST 149.84 FEET TO THE REAR CORNER OF LOTS 3 AND 4, THENCE SOUTH 44 DEGREES 51' 00" WEST 3.00 FEET, THENCE NORTH 45 DEGREES 09' 00" WEST 149.84 FEET TO THE SOUTHERLY RIGHT OF WAY LINE OF VERA AVENUE, THENCE NORTH 44 DEGREES 51' 00" EAST 3.00 FEET TO THE POINT OF BEGINNING.

SAID EASEMENT IS APPURTENANT TO AND FOR THE BENEFIT OF PARCEL I ABOVE AND WAS CREATED BY THAT CERTAIN AGREEMENT AND GRANT OF EASEMENT RECORDED ON OCTOBER 29, 1990 AS DOCUMENT NO. 90142510 OF OFFICIAL RECORDS OF SAN MATEO COUNTY, CALIFORNIA.

APN No: 058-335-040-0

# EXHIBIT 2

Customer Service  1-800-283-7918 †

Turn out of your account

View My Profile

Home | My Mortgage Summary | My Mortgage Summary / Tax & Insurance / Buying a Home | Refinancing a Home | Homeowner Assistance

You are currently viewing: XXXXXX0764

Lock or remove a CitiMortgage pe

## Your Mortgage Modification

View the terms of your modification which will make your payments more affordable. Check your status often to ensure that your paperwork has been accepted and find new requests for additional documentation

### Modification Status

📧 Print Page

07/08/2010 We received your complete modification document. Continue to make your future payments as detailed in the agreement.

We appreciate your business and look forward to being of service to you now and for all your future home financing needs.

### Modification Details

Mortgage Information *

|  | Current | Proposed |
|---|---|---|
| Product | FIXED 30 YR | FIXED 30 YR |
| Term (months) | 309 | 451 |
| Interest Rate | 6.00% | 2.00% |
| Principal Balance | $681,112.52 | $693,707.23 |

Payment Information

|  | Current | Proposed |
|---|---|---|
| Principal & Interest (P&I) | $4,376.72 | $2,189.21 |
| Taxes & Insurance (escrow) | $ 8,388.40 | 5,831.61 |
| Total Monthly Payment | $12,765.12 | $3,020.82 |

**The sample chart above is based on an interest rate reduction or a principal reduction. Total monthly payments are based on an estimated mortgage balance including interest, taxes and insurance. The final modification may vary depending on the review and verification of the financial information you have provided and other restrictions. A mortgage modification may be reported to credit reporting agencies

### Document Summary

View the status of pending documentation

† Calls are randomly monitored and recorded to ensure quality service

Equal Housing Lender

citigroup.com

[+] Feedback
Click here to
rate this page

# EXHIBIT 3

Citi

CitiMortgage

Customer Service: 1-800-283-7918 †          Sign out of your account

WAv My Profile≡. Your information is secure
Home
My Mortgage Summary
Buying a Home
Refinancing a Home
Homeowner Assistance

# Home

Link or remove a CitiMortgage account or application

**Pending Items**

Track the progress of your Homeowner's Assistance requests:

Account XXXXXXXX0764    Your mortgage modification is complete    view details
Continue to make your future payments as detailed in the agreement

**My Mortgage**      edit nicknames

| Account # or Nickname | Outstanding Balance | Last Paid Amount | Last Paid Date | Next Payment Due Date |
| --- | --- | --- | --- | --- |
| XXXXXXXX0764 | $ 681,112.52 | $ 3,021.64 | 09/31/2010 | 03/01/2010 |

Homeowner Assistance status:

Your mortgage modification is complete    view details
Continue to make your future payments as detailed in the agreement
view details



Finding a home.     Living the dream.

**Buying a New Home?**
Customize your mortgage to fit your needs.

>>Get Started

## Now is a great opportunity to evaluate your mortgage options with Citi.

Whether you need the security of a Fixed Rate Mortgage or the flexibility of an Adjustable Rate Mortgage, the product you're searching for is available with CitiMortgage

We'll help you compare interest rates and product information so you can easily find the right mortgage that fits your needs right now.
See Today's Mortgage Rates

**Fixed Rates, Assumes excellent credit**

| Interest Rate  | Points | APR |
| --- | --- | --- |
| **30 Year Fixed** | | About these rates |
| 4.875% | 0.500 | 5.089% |
| 4.750% | 1.375 | 5.131% |
| **15 Year Fixed** | | About these rates |
| 4.250% | 0.500 | 4.620% |
| 4.125% | 1.250 | 4.735% |
| Rates based on California | | |

## New Home Purchase

Find your dream home? Take advantage of our Guaranteed Rate Lock. CitiMortgage has competitive pricing and a closing process that will help get you into your new home sooner!
Get your new home mortgage started today!

**Calculators:**

What can I afford?
Should I refinance instead?

**Properties:**

CitiMortgage Properties for Sale

## Refinancing a Home

Refinancing your mortgage may lower your interest rate and payment, save you interest by shortening your term, help you consolidate debt or pay for an education and more!
Explore your refinance options today!

**Calculators:**

Am I better off refinancing?

**Announcements**

† Calls are randomly monitored and recorded to ensure quality service.

Equal Housing Lender

citigroup.com Privacy
 • Terms & Conditions

Security

Copyright © 2010 Citigroup Inc.

# EXHIBIT 4

**2010-122083**

2:39 pm 10/18/10 ND Fee: 21 00
Count of Pages 3
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*R0001062129*

RECORDING REQUESTED BY:

WHEN RECORDED MAIL TO:
CR TITLE SERVICES INC.
1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368

TS No.: T10-68824-CA/ APN: 058-335-040-0          SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

### IMPORTANT NOTICE

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS IT MAY BE SOLD WITHOUT ANY COURT ACTION,** and you may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account, which is normally five business days prior to the date set for the sale of your property. No sale date may be set until three months from the date this notice of default may be recorded (which date of recordation appears on this notice)

This amount is $38,925.55 as of 10-11-2010, and will increase until your account becomes current. While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have to pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three month period stated above) to, among other things. (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor. To find out the amount you must pay, or to arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

CitiMortgage, Inc
C/O CitiMortgage Inc.
ATTN: FORECLOSURE DEPARTMENT

TS No.: T10-68824-CA

## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368
Phone: 877-576-0472

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

## Remember, YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.

NOTICE IS HEREBY GIVEN: That CR Title Services, Inc. is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 05-06-2005, executed by WILLIAM H BASKIN, AND JUDI M BASKIN,. as Trustor, to secure certain obligations in favor of ABN AMRO MORTGAGE GROUP, INC., as beneficiary, recorded 05-12-2005, as Instrument No. 2005-077705, in Book , Page , , of Official Records in the Office of the Recorder of SAN MATEO County, California describing land therein as: AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST

including 1 NOTE(S) FOR THE ORIGINAL sum of $730,000.00, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

INSTALLMENT OF PRINCIPAL AND INTEREST PLUS IMPOUNDS AND / OR ADVANCES WHICH BECAME DUE ON 03/01/2010 PLUS LATE CHARGES, AND ALL SUBSEQUENT INSTALLMENTS OF PRINCIPAL, INTEREST, BALLOON PAYMENTS, PLUS IMPOUNDS AND/OR ADVANCES AND LATE CHARGES THAT BECOME PAYABLE.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

Dated: 10-12-2010

CR Title Services, Inc., AS AGENT FOR THE BENEFICIARY by FIRST AMERICAN TITLE INSURANCE CO., AS AUTHORIZED AGENT

BY: _____
Aaron Doty

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

TID-68824-CA

Declaration Re: Borrower Contact and Due Diligence Pursuant to CC §2923.5 and instructions to Trustee
Re: Notice of Default

Re:    WILLIAM H BASKIN
       2319 VERA AVE
       REDWOOD CITY, CA 94062
       CitiMortgage

The undersigned beneficiary or their authorized agent for the beneficiary hereby represents and declares
as follows:

1  x  On 9/8/2010 the beneficiary or their authorized agent contacted the borrower(s) to assess their
financial situation and to explore options to avoid foreclosure. During this contact the borrower(s) was
advised he or she has the right to schedule a follow-up meeting to occur within 14 days. Further,
the borrower(s) was provided the toll-free telephone number to find a HUD-certified housing
counseling agency

2. n/a  No contact was made with the borrower despite the due diligence of beneficiary or their authorized
agent's pursuant to California Civil Code §2923.5(g), including (a) Mailing a first-class letter to the
borrower(s) which included a toll free number to contact a HUD-certified housing counseling agency; (b)
Attempting to contact the borrower(s) by telephone at the primary telephone number on file at least three
times at different hours and on different days or determined that the primary and secondary phone
numbers on file were disconnected; and (c) Having received no response from the borrower(s) for 14 days
after the telephone contact efforts were complete, an additional letter was sent to the borrower(s) via
certified mail, with return receipt requested

3. n/a  The borrower has surrendered the secured property as evidenced by a letter confirming the
surrender or by delivery of the keys to the secured property to the beneficiary, their authorized agent or
the trustee.

4. n/a  The Beneficiary or their authorized agent has evidence and reasonably believes that the borrower
has contracted with an organization, person, or entity whose primary business is advising people who
have decided to leave their homes on how to extend the foreclosure process and to avoid their contractual
obligations to beneficiaries.

5. n/a  The beneficiary or their authorized agent has confirmed that the borrower(s) filed for bankruptcy
and the proceedings have not been finalized to wit, there is no order on the court's docket closing or
dismissing the bankruptcy case.

6. n/a  The provisions of California Civil Code §2923.5 do not apply because the loan is not a residential
mortgage loans originated between January 1, 2003 and December 31, 2007 secured by the borrower's
principal residence.

The undersigned instructs the trustee to proceed with non-judicial foreclosure proceedings and expressly
authorizes the trustee or their authorized agent to sign the notice of default containing the declaration re:
contact required pursuant to California Civil Code §2923.5

Dated:  10/12/2010

By:    Stephanie Young          _Stephanie Young_

# EXHIBIT 5

RECORDING REQUESTED BY
CR TITLE SERVICES INC.

AND WHEN RECORDED MAIL TO:
CR TITLE SERVICES INC.
1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368

---

T.S. No. T10-68824-CA / APN: 058-335-040-0

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## NOTICE OF TRUSTEE'S SALE

YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 05-06-2005. UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE. IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by a state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 of the Financial Code and authorized to do business in this state will be held by the duly appointed trustee as shown below, of all right, title, and interest conveyed to and now held by the trustee in the hereinafter described property under and pursuant to a Deed of Trust described below. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below. The amount may be greater on the day of sale.

Pursuant to California Civil Code Section 2923.54 the undersigned, on behalf of the beneficiary, loan servicer, or authorized agent, declares as follows:

[ X ] The mortgage loan servicer has obtained from the commissioner a final or temporary order of exemption pursuant to Section 2923.53 that is current and valid on the date the notice of sale is filed and
[ X ] The timeframe for giving notice of sale specified in subdivision (a) of Section 2923.52 does not apply pursuant to Section 2923.52 or 2923.55

Trustor: WILLIAM H BASKIN, AND JUDI M BASKIN,.
Duly Appointed Trustee: CR Title Services, Inc.
   C/O PITE DUNCAN, 4375 JUTLAND DRIVE, SUITE 200, SAN DIEGO, CA 92117 877-576-0472
Recorded 05-12-2005 as Instrument No. 2005-077705 in book , page of Official Records in the office of the Recorder of SAN MATEO County, California,
Date of Sale:02-09-2011 at 12:30 PM
   Place of Sale:   AT THE MARSHALL ST. ENTRANCE TO THE HALL OF JUSTICE AND RECORDS, 400 COUNTY
                    CENTER, REDWOOD CITY, CALIFORNIA
Amount of unpaid balance and other charges: $728,791.25
   Street Address or other common designation of real property:   2319 VERA AVE
                                                                   REDWOOD CITY, CA 94062

A P N : 058-335-040-0
Legal Description: AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST
The undersigned Trustee disclaims any liability for any incorrectness of the street address or other common designation, if any, shown above. If no street address or other common designation is shown, directions to the location of the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale. The Trustee shall incur no liability for any good faith error in stating the proper amount of unpaid balances and charges

For Sales Information please contact PRIORITY POSTING AND PUBLISHING at WWW.PRIORITYPOSTING.COM or (714) 573-1965

REINSTATEMENT LINE: 877-576-0472

Date: 01-19-2011

CR Title Services, Inc.
1000 TECHNOLOGY DRIVE MS 314
O'FALLON, MO 63368

KIMBERLY LEE, TRUSTEE SPECIALIST

Federal Law requires us to notify you that we are acting as a debt collector. If you are currently in a bankruptcy or have received a discharge in bankruptcy as to this obligation, this communication is intended for informational purposes only and is not an attempt to collect a debt in violation of the automatic stay or the discharge injunction.

**NOTICE OF SALE**
**PURSUANT TO SECTION 2924.8 OF THE CIVIL CODE**

Foreclosure process has begun on this property, which may affect your right to continue to live in this property. Twenty days or more after the date of this notice, this property may be sold at foreclosure. If you are renting this property, the new property owner may either give you a new lease or rental agreement or provide you with a 60-day eviction notice. However, other laws may prohibit an eviction in this circumstance or provide you with a longer notice before eviction. You may wish to contact a lawyer or your local legal aid or housing counseling agency to discuss any rights you may have.

出售公告
依据民法典第2924.8章

因本房产的拆迁程序已经开始，这可能会影响您在此继续居住的权利。从本通知起的二十天后，本房产可能会被出售。如果你是租房户，新的房主可能给你新的出租协议，或通知您在60天内搬家。但有些法律可能禁止在此情况下的消房，或可为您提供更长的搬家期限。您可以与您的律师，您当地的法律援助或房屋咨询机构讨论您的有关权利。

매매 통고
민법 제 2924 8 항에 의거

이 건물에 대한 차압 절차가 시작되었으며, 그로 인해 귀하가 이 건물에서 계속해서 거주할 수 있는 권리에도 영향이 미칠 수 있습니다. 이 통고문의 날짜로부터 20일 혹은 그 후에, 이 건물은 차압 매매될 수 있습니다. 만약 귀하가 이 건물을 임차하고 있다면, 새로운 건물 소유주는 귀하와 세임대차 계약을 허거나 또는 60일 이내 퇴거하라는 통고를 할 수 있습니다. 그러나, 다른 법률들은 이런 상황에서의 퇴거를 금지하거나 또는 귀하에게 퇴거하기 전까지 연장된 기간의 통고 하도록 할 수도 있습니다. 귀하의 권리에 대한 상담을 하기 위해 귀하는 변호사 또는 귀하가 있는 지역의 법률 구호 기관 혹은 주택 상담 기관에 연락할 수도 있습니다.

**ANUNCIO DE VENTA**
**SEGÚN LA SECCIÓN 2924 8 DEL CÓDIGO CIVIL**

El proceso de ejecución de hipoteca ha comenzado en esta propiedad, lo que puede afectar su derecho de vivir en esta propiedad. La propiedad puede ser vendida en ejecución de hipoteca veinte días o más después de la fecha de este aviso. Si usted está rentando esta propiedad, el nuevo dueño de la propiedad puede darle a usted un nuevo contrato de arrendamiento o alquiler o darle un aviso de desalojo de 60-días. Sin embargo, otras leyes tal vez puedan prohibir un desalojo en esta circunstancia o proveerle a usted un aviso de desalojo de más tiempo para que desaloje la propiedad. Tal vez usted desee comunicarse con un abogado o su ayuda legal de la localidad o agencia de consejería de vivienda para hablar de cualquier derecho que usted tal vez tenga.

**PAUNAWA SA PAGBENTA**
**BATAY SA SEKSYON 2924.8 NG NILAGDAANG SIBIL**

Ang proseso ng pagreremata ay nagsimula na sa pag-aaring ito, na kung saan ay maaaring makaapekto sa inyong karapatan na tuluyang manirahan sa pag-aaring nabanggit. Dalawampung araw o higit pa matapos ang petsang naisagawa ang paunawang ito, ang nasabing pag-aari ay maaari nang ibenta batay sa pagremata. Kung kayo ay nangungupahan sa pag-aaring ito, ang bagong may-ari ay maaaring magbigay ng bagong kasunduan sa paghiram o pagbenta o bigyan kayo ng kasulatan na paunawa na makalipat sa loob ng 60 na araw. Gayunpaman, maaaring ipagbawal ng ibang batas ang pagpapaalis sa pagkakataong ito o maaaring bigyan kayo ng mas mahabang panahon bago ang pagpapaalis. Minumungkahi kayong makipagbigay alam sa inyong abogado o lokal na katulong pang-legal o ahensiya ng payong pabahay upang pag-usapan ang alinmang karapatan na kayo ay mayroon.

**THÔNG BÁO BÁN**
**THEO ĐIỀU 2924 8 BỘ LUẬT DÂN SỰ**

Việc bắt đầu tịch thu lại sản này có thể ảnh hưởng đến quyền tiếp tục sinh sống của bạn tại đây. Bắt đầu từ hai mươi ngày trở đi sau thông báo, tài sản này có thể bị tịch thu để trả nợ. Nếu bạn đang mướn nhà tại đây, chủ tài sản mới sẽ gửi cho bạn cam kết mới về việc thuê hoặc mướn hoặc có thể sẽ gửi cho bạn thông báo rời khỏi nhà trong vòng 60 ngày. Tuy nhiên,một số luật khác có thể không cho phép việc yêu cầu rời khỏi nhà trong trường hợp này mà gửi cho bạn thông báo sớm hơn trước khi yêu cầu bạn rời đi. Bạn nên liên lệ với luật sư hoặc tổ chức giúp đỡ luật địa phương hoặc cơ sở tư vấn nhà để tham khảo những quyền bạn có.

Form 114c